IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MBIA INSURANCE CORP. and WELLS FARGO BANK, N.A., as TRUSTEE of CERTAIN SFC GRANTOR and OWNER TRUSTS, | : : : : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 02-1294-JJF |
| | : | |
| ROYAL INDEMNITY COMPANY, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO BANK, N.A., as TRUSTEE OF CERTAIN SFC GRANTOR and OWNER TRUSTS, | : : : | |
| | : | |
| Counterclaim Defendant. | : | |

Ronald S. Rauchberg, Esquire; Steven E. Obus, Esquire; André G. Castaybert, Esquire; Lisa A. Bauer, Esquire; Brian L. Friedman, Esquire and Erin Durba, Esquire of PROSKAUER ROSE LLP, New York, New York.
David C. McBride, Esquire; Melanie K. Sharp, Esquire; Dawn M. Jones, Esquire and Kristen Salvatore DePalma, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.
Attorneys Plaintiff and Counterclaim Defendant, Wells Fargo Bank, N.A.


Michael H. Barr, Esquire; Kenneth J. Pfaehler, Esquire and Lisa A. MacVittie, Esquire of SONNENSCHEIN NATH & ROSENTHAL LLP, New York, New York.
Philip Trainer, Jr., Esquire; Tiffany Geyer Lydon, Esquire and Andrew D. Cordo, Esquire of ASHBY & GEDDES, Wilmington, Delaware.

Attorneys for Defendant and Counterclaim Plaintiff, Royal
Indemnity Company.

_____

**MEMORANDUM OPINION**

October 25, 2007
Wilmington, Delaware

Farhan District Judge.

Pending before the Court is Wells Fargo Bank N.A.'s Motion

For Summary Judgment Dismissing Royal Indemnity Company's Amended

Counterclaim (D.I. 475). Royal Indemnity Company has responded

to the Motion with a Cross-Motion For Summary Judgment On Its

Amended Counterclaim (D.I. 511) and a Combined Opening and

Answering Brief. (D.I. 512.) For the reasons discussed, the

Court will grant Wells Fargo Bank N.A.'s Motion For Summary

Judgment Dismissing Royal Indemnity Company's Amended

Counterclaim and deny Royal Indemnity Company's Cross-Motion For

Summary Judgment On Its Amended Counterclaim.

## BACKGROUND

### I.   Procedural Background

This action was initially brought by Plaintiffs Wells Fargo

N.A. ("Wells Fargo") and MBIA Insurance Corporation ("MBIA") to

enforce unconditional guarantees in certain insurance policies

issued by Royal Indemnity Company ("Royal"). Royal filed a

Counterclaim alleging, among other things, breach of contract by

Wells Fargo. The initial action brought by Wells Fargo has since

been settled and the sole issue remaining before the Court is

Count III of Royal's Amended Counterclaim alleging breach of

contract against Wells Fargo.

## II.  Factual Background

This action arises in connection with the student loan fraud
scheme by Student Finance Corporation ("SFC") and its owner,
Andrew Yao.  SFC underwrote loans to students using funds
borrowed from PNC Bank and Wilmington Trust Company.  The student
loans were insured by insurance policies issued by Royal that
unconditionally guaranteed the students' repayment of principal
plus 90 days interest.  (Wells Fargo Appendix ("WF App.") at Ex.
6.)

SFC would then securitize large groups of insured student
loans by conveying them to eight different trusts.  Wells Fargo
acted as the Trustee for each of the trusts.  The trusts would,
in turn, sell fixed income notes, called "Certificates," to
investors.  When the students repaid their loans to the trusts,
the trusts could redeem the Certificates.  The student loans were
to be serviced by a servicing company affiliated with SFC, called
Student Loan Servicing LLC ("SLS").  SFC and SLS were controlled
by Yao.

When the student loans were securitized and conveyed to the
trusts, Royal would issue new insurance policies insuring the
same loans for the benefit of Wells Fargo, as the Trustee.  (Id.)
In each securitization, Wells Fargo entered into a Pooling and
Servicing Agreement ("PSA") that specified its duties.  (Id. at
Ex. 26 (PSA).)  Royal was not a party to the PSAs but claims

2

third party beneficiary status.

MBIA guaranteed payments of the Certificates issued by the trusts. If Royal failed to honor its policies, MBIA was required to supply funds to pay the Certificateholders. Royal earned over $35 million in premiums for insuring SFC loans. (Id. at Ex. 102 at No. 41.)

According to Royal's Amended Counterclaim, SFC systematically made payments on delinquent and defaulting loans to make it seem that the loans were performing. SFC referred to these payments as "forbearance payments." (Id. Ex. 83 at ¶ 60-62.) With one exception on August 19, 2001, SFC made the forbearance payments in large wire transfers to the collection accounts on one day in the last week of each month. Between January 2001 and March 2002, SFC made over $50 million worth of these payments.

Pursuant to the terms of the PSAs, SLS acted as Servicer on each of the loans. SLS was required to deal with student debtors, send them statements and demand payment from them if necessary. SLS was to open lock box accounts, instruct students to make payments on the accounts, and once a month, transmit the collected funds to collection accounts at Wells Fargo Bank. (PSA §§ 3.2, 3.3, 3.5.) SLS provided a monthly Servicer Report to various parties, including Royal and Wells Fargo, that included the payment, account balance, delinquency and default information

3

as requested by the parties to the transactions. (Id. at §
3.8(a).) Royal had the right to decide whether to renew or
terminate SLS as Servicer every 60 days during the life of each
transaction, and servicer renewal notices were circulated every
60 days for nearly two years, until SLS was terminated as
Servicer in 2002. (WF App. at Ex. 79; Ex. 74.)

The PSAs also provided for an Independent Accountant to
review the records and procedures of the Servicer and audit the
Servicer Reports. The Independent Accountant was required to
certify, among other things, that "nothing has come to the
Independent Accountant's attention to indicate that . . . the
information contained in such Servicer Reports . . . does not
reconcile with the information contained in the accounts and
records . . ." of the Servicer. (PSA § 3.16.) McGladrey &
Pullen served as the Independent Accountant under the PSAs and
issued a series of reports on the first four transactions in
April 2001, certifying that McGladrey had compared the Servicer
Reports with data maintained by SLS, including schedules of
delinquent and defaulted student loans, and concluded that the
amounts were in agreement, except for a few minor issues that
were subsequently resolved. (WF App. at Ex. 54.) Both Wells
Fargo and Royal received these reports. (Id. at Ex. 99 at No.1.)

As Trustee, Wells Fargo had several duties under the PSAs.
Royal's Amended Counterclaim centers on those duties provided for

4

in Section 8.19 and 8.21 of the PSAs. In relevant part, these

provisions provide:

**Section 8.19 Monitoring Duties of Trustee.** The
Servicer shall provide monthly to the Trustee
information and data via electronic transmission as
required by the Trustee, including without limitation,
the items described below. The Trustee, so long as it
is not a Successor Servicer, shall:

(a) in accordance with Section 3.8(b) hereof, not
later than 12:00 noon Minneapolis time on the second
Business Day preceding each Servicer Report Date,
accept delivery of the Tape used to calculate the
information contained in the Servicer Report and shall
accept delivery from the Servicer of a hard copy of the
Servicer Report;

(b) compare the information received on Tape from
the Servicer to the same received on the Servicer
Report with respect to delinquencies, ratios and the
aggregate principal balance of the Student Loans;

(c) review each Servicer Report issued by the
Servicer pursuant to this Agreement, solely in respect
of the mathematical accuracy thereof;

(d) inform the Insurer, MBIA, the Servicer, and
the Certificateholders as to any discrepancy on such
Servicer Report if the Servicer has not resolved such
discrepancy within 15 days after notice thereof from
the Trustee;

(e) prior to each Distribution Date, review the
monthly Servicer Report related thereto and:

(i) determine that such monthly
Servicer Report is complete on its face;

(ii) review the amounts on deposit in
the Collection Account against the monthly
distribution amounts set forth in such
monthly Servicer Report and reasonably
determine whether the amount on deposit is
sufficient to pay such distribution amounts;
and

5

(iii) determine the amount on deposit in the Liquidity Reserve Account; and

(f) no later than each Distribution Date, load the computer tape or diskette received from the Servicer pursuant to Section 3.8 hereof, confirm that such computer tape or diskette is in readable form, and calculate and confirm the aggregate Senior Certificateholder Balance and Interest-Only Notional Balance as of the most recent Record Date.

\* \* \*

## Section 8.21.  Servicer Monitoring Duties of the Trustee.

(a)  The Trustee, so long as it is not a Successor Servicer, will perform the services set forth in this Section 8.21 which shall not be delegated to the Servicer, but may be assigned to a subcontractor of Trustee as provided in Section 3.1 hereof.  The Trustee shall, unless it is prohibited as a matter of law, as evidenced by an opinion of counsel, and unless a different Successor Servicer is appointed by the Insurer or MBIA, as applicable, service the Student Loans upon receipt of a Servicer Termination Notice under this Agreement or upon termination of the Servicer pursuant to Section 3.2 hereof.  The Trustee will, on a periodic basis, perform the functions specified in this Section 8.21, provided that the Trustee shall be entitled to request of and receive from the Servicer, all information necessary to conduct tests or make reports in a timely manner as specified below and, except as otherwise specified herein, the Trustee shall be entitled to assume for all purposes that the information received by it is true, correct and complete and the Trustee shall be fully protected in relying upon such information without any independent investigation or audit to prove the facts stated therein.

(b)  Other than as specifically set forth elsewhere in this Agreement, the Trustee shall have no obligation to supervise, verify, monitor or administer the performance of the Servicer and shall have no liability for any action taken or omitted by the Servicer.

6

     (c)   The Trustee shall consult fully with the Servicer as may be necessary from time to time to perform or carry out the Trustee's obligations hereunder, including the obligation, if requested by the Insurer or MBIA, as applicable, to succeed at any time to the duties and obligations of the Servicer as servicer under Section 3.2 hereof.

     (d)   The Trustee shall receive an electronic transmission of all servicing and/or Student Loan File information (including all relevant Obligor contact information, such as address and telephone numbers, as well as Student Loan principal balance and payment information, including any comment histories and collection notes) and shall review such Student Loan File information to ensure that it is in readable form and verify that the data balances conform to the trial balance reports received from the Servicer.  In addition, the Trustee shall store such Student Loan File information and verify certain information contained in each Servicer Report.  The Trustee shall receive the date referenced in this paragraph on a weekly basis; provided that, at the request of MBIA, the Trustee shall receive, and the Servicer shall provide, any such servicing and/or Student Loan File information from the Servicer on a more frequent basis, up to and including daily transmissions.

(PSA §§ 8.19, 8.21, underlining in original.)

In connection with its duties under Section 8.19, Wells Fargo electronically received from the Servicer, for each SFC securitization, two Microsoft Excel spreadsheets.  The first spreadsheet was entitled "Delinquency Aging Report" and contained loan-level data on current and delinquent loans, including names, social security numbers, outstanding balances and delinquency status.  The second spreadsheet was entitled "Default Schedule" and contained similar information on loans that had defaulted during the month.  Wells Fargo compared the

7

delinquency and default information summarized in the monthly
Servicer Report with the delinquency and default information
contained in the two spreadsheets.  (WF App. at Ex. 1; Ex. 93 at
33-34; Ex. 34-35; Ex. 68-69.)

Royal does not dispute that Wells Fargo performed this
monthly comparison, but contends that Wells Fargo should have
been comparing weekly computerized tape updates with the Servicer
Reports.  Royal alleges that had this comparison been made, Wells
Fargo would have discovered the SFC "forbearance payments" and
Royal would not have engaged in future transactions with SFC
resulting in the issuance of additional insurance policies.

## STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil
Procedure, a party is entitled to summary judgment if a court
determines from its examination of "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any," that there are no genuine issues of
material fact and that the moving party is entitled to judgment
as a matter of law. Fed. R. Civ. P. 56(c).  In determining
whether there are triable issues of material fact, a court must
review all of the evidence and construe all inferences in the
light most favorable to the non-moving party.  Goodman v. Mead
Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).  However, a
court should not make credibility determinations or weigh the

8

evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097 (2000). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catreet, 477 U.S. 317, 323 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of his case for which he bears the burden of proof, the moving party is entitled to judgment as a matter of law. Id. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## DISCUSSION

### I. Whether Wells Fargo Is Entitled To Summary Judgment On Royal's Amended Counterclaim That Wells Fargo Breached Section 8.19 Of The PSAs

The parties' arguments concerning Wells Fargo's alleged breach of Section 8.19 of the PSAs centers, in the first instance, on the meaning of the terms "tapes," as used in that section. Both Royal and Wells Fargo contend that the term is unambiguous, and therefore, may be interpreted by the Court as a matter of law.

9

Royal contends that the term "tapes" is expressly defined to
include weekly computer tapes in Section 1.1 of the PSAs, which
in turn references a more precise definition set forth in Section
3.8(b)[1] of the PSAs.  Royal further contends that Sections 8.19
and 6.17 of the PSAs are the only sections which require Wells
Fargo or anyone else to take any action with respect to the
tapes, and therefore, the Section 3.8 definition must have been
meant to apply to Sections 8.19 and 6.17.[2]  Royal also contends
that Section 8.19(b) does not reference back or incorporate
Section 8.19(a), and therefore, Section 8.19(a) cannot be used to
alter the meaning of the defined term "tapes."

Wells Fargo contends that the term "tapes" is clearly
defined by the context of Section 8.19 to refer to only monthly

_____

[1]     Section 3.8(b) provides:

> (b)  Weekly Computer Tape Update.  The Servicer shall
> deliver to the Trustee on or prior to 12:00 noon
> Minneapolis time on each Weekly Report Date and on each
> Servicer Report Date an update of the computer tape,
> diskette or other computer readable medium, in a format
> acceptable to the Trustee which provides information as
> to the Student Loans reflecting the information set
> forth thereon as of the preceding Servicer Report Date
> (the "tape"), together with any information with
> respect to the changes in the computer software
> programs used to generate the computer tape, diskette
> or other medium, as the case may be, necessary to
> render such computer tape readily usable by a Successor
> Servicer.   The Servicer shall provide the Trustee with
> a hard copy of the Servicer Report on each Servicer
> Report Date.

[2]     Royal does not assert a breach of Section 6.17 of the
PSAs.

10

tapes and not weekly tapes. Wells Fargo points out that Section
1.1 of the PSAs defines certain phrases "unless the context
otherwise requires." Wells Fargo contends that the context of
Section 8.19 "otherwise requires" the term "tapes" to be
construed as monthly tapes. Wells Fargo further points out that
Section 8.19 refers to the "Tape used to calculate the
information contained in the Servicer Report." Since the
Servicer Report is a monthly report, Wells Fargo contends that
the tape referred to in Section 8.19 must also be the monthly
tape.

The parties agree that the duties of the Trustee under the
PSAs are governed by Minnesota law and federal law. All other
rights, obligations and remedies under the PSAs are governed by
Pennsylvania law. Both parties also agree that there is no
significant difference between Minnesota and Pennsylvania
substantive law, and therefore, the Court finds cases from both
jurisdictions to be instructive.

The paramount goal of contract interpretation is to
effectuate the intent of the parties. Morningstar v. Hallett,
858 A.2d 125, 129 (Pa. Super. 2004). The words of a contract are
considered the best indicia of the parties' intent. Bohler-
Uddenholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d
Cir. 2001) (citing Krizovensky v. Krizovensky, 624 A.2d 638, 642
(Pa. Super. 1993)). The terms of a contract are construed

11

consistently with their plain and ordinary meaning.  <u>Knudsen v.</u>
<u>Transport Leasing/Contract, Inc.</u>, 672 N.W.2d 221, 223 (Minn. App.
2003).  The construction of a contract is a question of law,
unless there is an ambiguity.  <u>Turner v. Alpha Phi Sorority</u>
<u>House</u>, 276 N.W.2d 63, 66 (Minn. 1979).

Because the contract is presumed to convey the parties'
intent, it will only be considered ambiguous if "'it is
reasonable or fairly susceptible of different constructions and
is capable of being understood in more senses than one and is
obscure in meaning through indefiniteness of expression or has a
double meaning.'"  <u>Bohler-Uddenholm</u>, 247 F.3d at 93 (citations
omitted); <u>Holm v. Quinn</u>, 2004 WL 887190 (Minn App. 2004).  A
contract is not ambiguous if its meaning can be determined
"without any guide other than a knowledge of the simple facts on
which, from the nature of the language in general, its meaning
depends."  <u>Bohler-Uddenholm</u>, 247 F.3d at 93.  Extrinsic evidence
is generally not considered in determining whether an ambiguity
exists.  <u>In re Hennepin County 1986 Recycling Bond Litigation</u>,
540 N.W.2d 494, 498 (Minn. 1995).  Rather, the determination of
whether an ambiguity exists in the first instance is guided by
"'the words of the contract, the alternative meaning suggested by
counsel, and the nature of the objective evidence to be offered
in support of that meaning.'"  <u>Bohler-Uddenholm</u>, 247 F.3d at 93
(quoting <u>Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.2d

12

1001, 1011 (3d Cir. 1980)).  Moreover, the mere fact that the
parties disagree on the proper construction of a contract is
insufficient to render the contract ambiguous.  Id.  Whether an
ambiguity exists is a question of law.  Blattner v. Forster, 322
N.W.2d 319, 321 (Minn. 1982).

Applying these principles to the PSAs, the Court concludes
that the meaning of the term "tape," as used in Section 8.19 and
in the context of the PSAs as a whole, is not ambiguous.  Section
8.19 begins with the obligation of the Servicer to provide
certain data to the Trustee on a monthly basis.  That data and
its delivery time is then described more fully in Section 8.19(a)
as including "the Tape used to calculate the information
contained in the Servicer Report."  (PSA § 8.19(a).)  It is
undisputed that the Servicer Report is a monthly report.
Moreover, Section 8.19(b) then requires the Trustee to "compare
the information received on Tape from the Servicer to the same
received on the Servicer Report with respect to delinquencies,
ratios and the aggregate principal balance of the student loans."
(Id.) (emphasis added.)  Thus, the Court concludes that the
"tape" to be accepted by the Trustee each month under Section
8.19(a) and used in the comparison required by Section 8.19(b)
was a monthly tape.

Royal contends that the term "tape" must be defined
consistently with the definitions provided in the PSAs, and

therefore, it must include the weekly tapes.  Section 1.1 lists
the term "tape" as a defined term and references Section 3.8(b)
as providing the definition for the term; however, Section 1.1
expressly states that the defined words are only given the
meaning ascribed in Section 1.1, "unless the context otherwise
requires."  The context of Section 8.19 is clear that the
comparison contemplated was a monthly comparison between monthly
tapes used to calculate the information contained in the Servicer
report and the monthly Servicer Reports, and therefore, the Court
is not persuaded by Royal's argument.

     In the alternative, Royal contends that, even if the term
tapes refers to monthly tapes, Wells Fargo should have discovered
the one-day, no principal payments from SFC.  As Wells Fargo
points out, however, the Servicer Reports to which the monthly
tapes were compared did not contain line items showing the dates
the payments were received or how the payments were allocated to
principal or interest.  The Servicer Report also did not show who
submitted the payments.  Thus, Wells Fargo could not have
compared the information Royal contends was evident and/or
important on the monthly tapes "to the same" on the Servicer
Report, because the Servicer Report did not contains such
information.  Moreover, the information Royal highlights was not
relevant to the comparison Wells Fargo was required to make under
the express language of Section 8.19, which was a comparison of

14

"the information received on Tape from the Servicer to the same received on the Servicer with respect to delinquencies, ratios and the aggregate principal balance of the Student Loans," and Royal has not identified any discrepancies between the monthly tapes and the items required to be compared under Section 8.19. (PSA § 8.19, emphasis added.) In addition, the discrepancies required to be reported to the Insurer, MBIA and the Certificateholders under Section 8.19(d) were "discrepancies on such Servicer Report." Royal does not explain how the information it highlights on the monthly tapes created a "discrepancy" on the Servicer Report that would have required reporting under the PSAs. Accordingly, the Court concludes that Wells Fargo is entitled to summary judgment on Royal's breach of contract Counterclaim under Section 8.19 of the PSAs.

## II. Whether Wells Fargo Is Entitled To Summary Judgment On Royal's Amended Counterclaim That Wells Fargo Breached Section 8.21 of the PSAs

Royal also asserts in its Amended Counterclaim a third-party beneficiary breach of contract claim against Wells Fargo on the basis of Section 8.21 of the PSAs. Royal contends that its third-party beneficiary status is created under Section 11.9 of the PSAs and is not limited to any specific provisions of the PSAs. Royal also contends that Wells Fargo failed to perform the balancing and verification duties required by Section 8.21.

Although Wells Fargo did not dispute Royal's third party beneficiary status under Section 8.19 of the PSAs, Well Fargo contends that Royal is not a third party beneficiary of Section 8.21. Specifically, Wells Fargo contends that Section 8.20 of the PSAs limits the third party beneficiaries of Section 8.21 to the Certificateholders. Wells Fargo also contends that under Section 8.20, Wells Fargo had no liability for its Section 8.21 monitoring duties.

To have standing to recover on a contract as a third party beneficiary, the contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must affirmatively appear in the contract. Scarpitti v. Weborg, 609 A.2d 147, 149 (Pa. 1992). A party can be a beneficiary of some promises in a contract and not of others. See e.g., Warner v. U.S. Secs. & Futures Corp., 685 N.Y.S.2d 25, 26 (N.Y.A.D. 1st Dep't 1999) (holding that third party beneficiary of an agreement could not enforce the arbitration provision, because it was "not obvious" that the agreement intended to make the third party a beneficiary of that provision); Northwest Airlines, Inc. v. Crosetti Bros., Inc., 483 P.2d 70, 72 (Or. 1971) ("A contract may consist of a series of promises . . . Third parties may be beneficiaries of some of these promises and not of others . . ."). Two tests are used to determine whether a party is a third party beneficiary, the

16

intent-to-benefit test, and the duty owed test. <u>Eischen Cabinet</u>
<u>v. New Tradition Homes, Inc.</u>, 2006 WL 3593051 (Minn. App. Dec.
12, 2006). In this case, the applicable test is the intent-to
benefit test.

The intent to benefit test is satisfied when the
circumstances indicate that the promisee intends to give the
beneficiary the benefit of the promised performance. <u>See e.g.</u>,
<u>Scarpitti</u>, 609 A.2d at 149-150. These circumstances include
whether the contract expresses some intent by the parties to
benefit a third party and whether performance is to be rendered
directly to a third party. <u>Eischen Cabinet</u>, 2006 WL 3593051 at
*4. The party asserting third party beneficiary status bears the
burden of demonstrating that the contract, or a provision
thereof, was made for its benefit. 13 <u>Williston on Contracts</u> §
37:8.

In this case, Section 11.9 of the PSAs provides the starting
point for the third party beneficiary analysis. Specifically,
Section 11.9 provides:

**Section 11.9 Third Party Beneficiaries**. Except as
otherwise specifically provided herein with respect to
the Certificateholders, the parties to this Agreement
hereby manifest their intent that no third party other
than each Certificateholders, the Insurer and MBIA
shall be deemed a third party beneficiary of this
Agreement, and specifically that the Obligors are not
third party beneficiaries of this Agreement.

(PSA § 11.9.) Thus, the Insurer, in this case Royal, is an
intended beneficiary of the PSAs "except as otherwise

17

specifically provided herein with respect to the

Certificateholders." (Id., emphasis added.) The Court concludes

that the limitations set forth in Section 8.20 of the PSAs fit

this proviso. In this regard, Section 8.20 provides that "[t]he

Trustee, so long a it is not a Successor Servicer, shall monitor

the performance of the Servicer on behalf of the

Certificateholders . . ." (PSA § 8.20, emphasis added.) Thus,

Section 8.20 expressly carves out the Certificateholders as the

beneficiaries of the duties described in Section 8.21. Stated

another way, the Court concludes that Section 8.20 limits the

third party beneficiaries of Section 8.21 to the

Certificateholders. Because the third party beneficiaries

defined in Section 11.9 of the PSAs are limited with regard to

Section 8.21 by the express terms of Section 8.20, the Court

concludes that Royal lacks standing to assert a breach of Section

8.21, as a third party beneficiary.

In the alternative, however, even if Royal is considered a

third party beneficiary of Section 8.21, the Court concludes that

Wells Fargo has no liability for breach of its duties under that

Section. In this regard, Section 8.20 also provides that "the

Trustee shall not have any liability in connection with the

malfeasance or nonfeasance by the Servicer or for monitoring the

Servicer." (Id., emphasis added.) Royal directs the Court to

Section 8.5 of the PSAs for the proposition that "no provision of

18

the contract shall relieve the Trustee of its duties to perform
the obligations it has undertaken in the PSAs." (D.I. 512 at
13.) However, the language of Section 8.5 is not as sweeping as
Royal suggests. Specifically, Section 8.5 lays out a variety of
duties for which the Trustee has no liability, and then goes on
to state: "provided, however, that none of the foregoing shall
relieve the Trustee of its obligation to perform its duties under
this Agreement." (PSA § 8.5, emphasis added.) Stated another
way, the caveats in Section 8.5 may not limit the Trustee's
liability to perform its other duties under the PSAs, but that
does not mean that the Trustee's liability cannot be limited by
other provisions of the contract. In this case, Section 8.20
limits the Trustee's liability with respect to its Section 8.21
duties, and there is nothing in Section 8.5 which precludes the
limitation of liability through another provision of the PSAs.
Because Section 8.20 disclaims any liability on the part of the
Trustee for its Section 8.21 duties, the Court concludes that
Wells Fargo is entitled to judgment as a matter of law on Royal's
Amended Counterclaim asserting breach of contract under Section
8.21 of the PSAs.

## CONCLUSION

In sum, the Court concludes, as a matter of law, that Royal
cannot succeed on its breach of contract Counterclaims.
Accordingly, for the reasons discussed, the Court will grant

19

Wells' Fargo's Motion For Summary Judgment and deny Royal's
Cross-Motion For Summary Judgment.

An appropriate Order will be entered.